## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

RELIABLE SALVAGE AND TOWING, INC.,

                Plaintiff,

-vs-                                          Case No.  2:09-cv-329-FtM-99SPC

35' SEA RAY its engines, tackle, equipment,
apparel, appurtenances, etc., in rem; MICHAEL
BIVONA in personam,

                Defendants.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      This matter comes before the Court on the Plaintiff's Complaint (Doc. # 1) filed on May 21,

2009.  The Parties consented to trial by United States Magistrate Judge (Doc.# 40) on December 21,

2010.  The District Court approved the consent to trial by United State Magistrate Judge  (Doc. # 41)

on December 21, 2010.   In its Complaint, the Plaintiff alleges that on or about March 16, 2008, the

Plaintiff rescued the Defendant Michael Bivona and his 35' Sea Ray Vessel from a shoal in and

around Gasparilla Pass near Boca Grande, Florida.  Title 28 U.S.C. § 1333 grants federal courts

subject matter jurisdiction of all cases involving admiralty and maritime claims. A salvage claim is

within the admiralty jurisdiction of the federal courts. Boat Raising and Reclamation v. Victory, a

56' Dania Custom Boat, 2007 WL 4462995 *6  (M.D. Fla. Dec. 7, 2007) (Treasure Salvors, Inc. v.

Unidentified Wrecked & Abandoned Sailing Vessel, 640 F.2d 560, 566 (5th Cir.1981)).  The Court

has jurisdiction over the dispute and the parties in this case.

On January 19, 2011, a bench trial was held before the undersigned.  The Court heard testimony and reviewed evidence submitted by both Parties.  The Plaintiff called Captain Kyle Potts, Towing Master and Reliable Salvage and Towing's Operations Manager, the Defendant Michael Bivona, the owner of the 35' Sea Ray (Sea Ray)[1], and Captain Jerry Smith, the owner of Reliable Salvage and Towing as witnesses.  The Plaintiff entered into evidence  seven (7) photos of the Sea Ray salvage operation (Pl. Ex. 1A-G), the work form signed by Michael Bivona (Pl. Ex. 2), printouts from the Florida Department of State (Pl. Ex. 3), regarding Michael Bivona, a corporation printout for American Casualty Audit Group, Inc., printouts describing the nature and business of American Casualty Audit Group (Pl. Ex. 4-6), a letter requesting arbitration from Atty. Frank D. Butler (Pl. Ex. 7), a tide chart for March 16, 2008 (Pl. Ex. 8), and printouts of Sea Tow listings (Pl. Ex. 9). See (Doc. # 59).  The Defendants called Michael Bivona as their only witness, and submitted into evidence the Reliable Salvage and Towing's service form (Def. Ex. 1), 2008 NOAA tide predictions for Port Boca Grande and Charlotte Harbor areas (Def. Ex. 2), 2008 NOAA tide predictions for Placida and Gasparilla Sound (Def. Ex. 3), NOAA nautical chart for Gasparilla Sound (Def. Ex. 4), the State of Florida Vessel Registration for the Sea Ray (Def. Ex. 5), Marine Max work orders for the Sea Ray (Def. Ex. 6), and six (6) photographs of the Sea Ray grounded on the shoal (Def. Ex. 7). See (Doc. # 60).

After the trial concluded, the Defendant, Michael Bivona, made an Oral Motion for Directed Verdict (Doc. # 54) on January 19, 2011.  Likewise, the Plaintiff, Reliable Salvage, made an Oral

---

[1] The Sea Ray was mistakenly denoted as a 35' Sea Ray vessel when in fact the vessel is a Sea Ray 320 which is a 32' vessel.  Although the vessel is in fact 35' in length from stem to stern.  For the purposes of this Findings of Fact and Conclusions of Law the vessel will simply be referred to as the Sea Ray.

Motion for Directed Verdict (Doc. # 55) on January 19, 2011. The Court reserved ruling on both

Motions until the evidence could be reviewed. After a review of the evidence and testimony from

the trial and the Parties subsequent briefs, the Court finds good cause to deny the Oral Motions for

Directed Verdict. Therefore, since the case was tried before the Court without a jury, the Court must

issue Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 52(a).

## **FINDINGS OF FACT**

It is undisputed that Bivona ran the Sea Ray onto a shoal in Gasparilla Pass near Boca

Grande, Florida, on Sunday, March 16, 2008. Bivona testified that he was returning home from a

weekend trip when he grounded the Sea Ray on a sandy shoal in the Pass. According to Bivona, he

called Sea Tow when he first ran aground. Bivona stated that he was a member of Sea Tow, an

organization that provides towing and salvage services to members whose vessels are stranded on

the water. The Sea Tow boat captain arrived on the scene, however, he did not have the necessary

equipment to tow the Sea Ray off the shoal. The Sea Tow captain informed Bivona that he would

need at least two (2) vessels to remove the Sea Ray from the shoal. However, the Sea Tow captain

told Bivona the Sea Ray would probably float free from the shoal at high tide around 8:30 to 9:00pm.

that evening. The Sea Tow vessel then left the scene after telling Bivona that he would return at high

tide to tow him off the shoal.

Bivona then observed Capt. Potts towing another vessel through Gasparilla Pass. Bivona

hailed Capt. Potts who approached Sea Ray's grounded position. Capt. Potts informed Bivona that

he would return to his position after he had finished the short tow taking the other vessel back to the

docks. Upon his return, Capt. Potts surveyed the Sea Ray's position on the shoal. Capt. Potts

testified the Sea Ray was heeled over on its side at about a thirty (30) degree angle in about ten (10)

inches of water.   After surveying the boat, Capt. Potts informed Bivona that he would need another boat to free him from the shoal.

The vessel Capt. Potts arrived in was a smaller vessel with an outboard motor and did not have the low range gear and towing capability of the suggested second vessel.  Capt. Potts radioed for the other vessel and eventually called for a third vessel to aid in the salvage operation.  Reliable's other  vessels called by Capt. Potts are designed to run in shallow water.  Capt. Potts explained that the other vessels were larger with a lower gear ratio and inboard motors that would allow them to perform a "light wash" which would excavate a channel by backing the vessels up to the Sea Ray's position.  Capt. Potts testified that the work itself was a combination of positioning Reliable Towing's two primary vessels in such a way as to wash a channel back to Bivona's vessel and create a deep enough trough to be able to pull and wash the Sea Ray off the shoal and into deeper water.

Capt. Potts explained that the Reliable Towing's vessels have to work in unison so as to prevent a re-filling of the dredge materials either around their own vessels or around the Sea Ray. Capt. Potts testified that the prop washing is exceptionally hard on Reliable's Towing's vessels due to the sediment which is churned and brought back to the applying vessels. The vessels also have to coordinate between pulling on the grounded vessel under high strain, and continuing to wash out debris. In this case, it is notable that a midship cleat on the Sea Ray tore loose under strain of the pull and shot back at one of the Reliable Towing's vessels.

Capt. Potts testified that the light wash method employed by the Reliable Salvage vessels was the only way to free the Sea Ray from its location on that day, because the tide would not have been high enough for the Sea Ray to float free on its own.  Capt. Potts explained that March 16, 2008, was a two (2) tide day instead of a four (4) tide day.  He also noted that the tide was just off a moon on

the calendar week of March 16, 2008.  Low tide that day was .2 and occurred at 2:23pm. or just about the time the Sea Ray was grounded.  High tide was expected to be approximately 1.5 and was not expected to occur until 9:09pm that evening. Capt. Potts explained in layman's terms that the high tide on that particular day would only raise the water level on the shoal by approximately four (4) inches.

The Sea Ray was eventually floated after several hours of work by the Plaintiff who used three vessels to free the Sea Ray.  The Sea Ray then left under its own power after it was towed to deeper water out in the Pass.

Capt. Potts also testified regarding the form signed by Bivona while at the scene.  According to Capt. Potts, he brought the form to Bivona on the Sea Ray, explained that this was a salvage operation, and gave a general ball park of how the job would be charged. Captain Potts testified that he obtained the biographical information found on the form from Bivona.  Bivona testified that he did in fact give the information to Capt. Potts, which included three different telephone numbers where he could be reached.  Bivona testified as to the accuracy of the information provided to Captain Potts and that he gave over the form to Bivona to examine.  Bivona testified that he did sign "something" that day given to him by Captain Potts, but could not state that the signature on the bottom of the paper was actually his.  However, Bivona did not remember signing any other document or paper for Capt. Potts.   The Defendant Bivona openly admits that he did not read the form.  The Court finds that the document that the Defendant Bivona signed was the same document given to him by Capt. Potts.

The form states that "[t]he undersigned agrees to pay in full all charges including attorney's fees and costs should collection procedures be necessary." (Plaintiff's Ex. # 2).   The form

furthermore contains an arbitration provision, which states: "Disputes arising out of this agreement will be resolved by Arbitration in a mutually agreed upon domestic arbitration forum." (Pl. Ex. # 2). Bivona agrees that the Plaintiff demanded arbitration, but that he refused arbitration. (Doc. # 62, Stip. 17 ). The costs for salvaging the Sea Ray totaled $7,523.10, which includes $1,123.10 for run time, and $6,400.00 based upon a charge of $200.00 per foot at thirty-two (32) feet. It was agreed by Bivona in trial that nothing has been paid to the Plaintiff up to trial. (Doc. # 62, Stip. 19).

Capt. Potts informed Bivona that his insurance should pay for the salvage.  However, Bivona's insurer failed to pay the invoiced amount.  Bivona testified in his good faith belief that his insurer would pay for the services he obtained from Reliable. In fact, there was testimony that Bivona gave Reliable the names of two insurers, neither of which paid anything on the invoice. Bivona stated that the insurance failed due to a mistake by his insurer.  Capt. Potts testified that he tried to call Bivona on several occasions to discuss the outstanding bill, but was never able to reach him.  He further testified that Bivona never returned his calls.

Capt. Potts also testified regarding the Sea Ray's "marine peril" noting the vessel was hard aground, incapable of removing itself, and that favorable conditions that would float the Sea Ray free from the shoal  would not return for several days. He consulted the tide charts kept on his vessel, and by use of a GPS device onboard, to determine that if the vessel was to be removed it needed to be done without delay. Both the Plaintiff (Pl. Ex. 8) and the Defendant (Def. Ex. 2 & 3) submitted tide charts. Capt. Potts discussed the tide charts and demonstrated that the Sea Ray was removed at or near the high tide mark for that location. It is notable that just before the vessel was freed that Reliable's men were still pulling the vessel under strain or tow ropes and still washing debris from under the vessel.  Capt. Potts also testified, uncontradicted, that an approaching storm would make

-6-

extracting the vessel more difficult. He further stated that the vessel would be subject to an approaching cold front storm, fog that had been drifting in and out of the area all day, as well as the danger that another vessel might strike the Sea Ray in the night if it had to sit on the shoal for several days. Capt. Potts also noted that the vessel stranded alone on a shallow shoal for several days would also be susceptible to burglary.

Capt. Jerry Smith founded Reliable Salvage in 1972 and is currently Reliable's president. Capt. Smith has been involved in the marine salvage business since 1961. Capt. Smith testified that severe groundings are the most common type of salvage and that over the years he has worked approximately fifty (50) salvages in the same area where Bivona was grounded. Capt. Smith testified about the rates that were charged to Bivona. He stated for the year 2008 that $200 per foot, plus run time would be at the bottom of the usual and customary scale which Reliable was allowed by agreement with Boat/U.S. to charge for salvage. Boat/U.S. is the franchiser for Reliable Salvage's salvation and towing operation. Capt. Smith testified that there are approximately 550,000 members involved with Boat/U.S. and that they are influential in setting the prices charged by the franchisees like Reliable. He further stated that Boat/U.S generally monitored Reliable's rates to assure that they were in line with Boat/U.S. expectations. According to Capt. Smith, the price range approved by U.S. Boats for salvaging a vessel of similar size as the Sea Ray is between $200.00 and $300.00 per foot. He testified that his rate for a salvage operation like the one performed on the Sea Ray was at $200.00 per foot and had remained at that price for the last eight (8) years. The Court concludes that the rate charged by Reliable Salvage was reasonable and within the industry standards for salvage operations.

Capt. Smith also testified that the vessels used in the Reliable business are under significant distress during an operation such as that performed for Bivona. He stated that significant engine deterioration occurs and that as few as three such jobs would require Reliable to undertake significant engine repairs. Capt. Smith also spoke of the cost of crew and fuel in projects such as the instant case, wherein the fuel charges are significant and the crew typically receives one-third of the stated invoice. Capt. Smith also testified about the financial burden of collecting against boaters who fail to pay such invoices.

Capt. Smith's testimony supported the manner in which the Sea Ray was extracted. He further supported the testimony of Capt. Potts as to the exigency of removing the vessel that there would be no good tides for several days. Capt. Smith's testimony concurred with that of Capt. Potts stating that the high tide on March 16, 2008, would not have been sufficient to float the Sea Ray off the shoal where it was grounded. He testified that other vessels had collided on that same shoal partly due to the poor channel markers which look similar to the markers warning of the shoal.

Additionally, Capt. Smith testified that because of Bivona's failure to pay, or that of any insurer for him, that Reliable was required to retain the services of counsel and had agreed to pay the fees and costs associated with collection of the invoice. Capt. Smith stated that attorney Frank D. Butler was the attorney chosen for that task. Capt. Smith stated that the amounts charged to Michael Bivona were typical of those he would have charged any other vessel under the same circumstances.

The Defendant Bivona was called as a witness for the Defense and the Plaintiff. Bivona testified that he ran the Sea Ray aground on a shoal in Gasparilla Pass on March 16, 2008. He stated that the vessel was grounded in about five (5) to ten (10) inches of water. Following the grounding,

Bivona called Sea Tow Services for assistance. Bivona had a contract with Sea Tow. Sea Tow informed Bivona that they could not remove him from the shoal without the assistance of another vessel, however the Sea Tow Captain informed him that if he would wait the Sea Ray would float free at high tide. Bivona testified that the sea's were calm and the weather was fair on March 16, 2008.

After the Sea Tow vessel left, Bivona noticed the Reliable vessel towing another vessel through the Pass back to the docks. Bivona hailed the Reliable vessel captained by Capt. Potts. Bivona stated that he spoke with Capt. Potts yelling from his boat to Capt. Potts' vessel. Capt. Potts informed him that he could return and help him free the Sea Ray. Bivona testified that Capt. Potts returned, surveyed the Sea Ray on the shoal, and informed Bivona that it would take another Reliable vessel to free the Sea Ray. Bivona said that Capt. Potts told him his insurance would pay for the salvage of the Sea Ray. At that time, Bivona says he gave Capt. Potts his information.

Capt. Potts had Bivona sign the form at issue in this case. According to Bivona, Capt. Potts told him that he needed to sign the form in order to call another Reliable vessel to help remove the Sea Ray from the shoal. Bivona testified that he signed a form, but would not acknowledge that the form presented in evidence (Pl. Ex. 2) was the form he signed that day. Bivona stated that he did not read the form presented to him by Capt. Potts and further would not admit that the signature on the form was his. Bivona did say that the form was blank when he signed and that he never read the printing on the back side of the form.

Capt. Potts submitted his costs to Bivona's insurance company, however, the insurance on the Sea Ray had expired. Bivona testified that he never received notice of cancellation from his insurance company relating to the Sea Ray's policy and he felt the insurer was responsible for paying

Reliable's fee.  However, Bivona also testified that he recognized that the failure of his insurance to pay the Plaintiff was not the Plaintiff's problem to solve. Bivona admitted in open court that he well understood that when his insurance failed to pay the invoice, that it was his, Bivona's, responsibility to pay the bill. Bivona also admitted that he had still paid nothing on the invoice which was now approaching three years past the date of the incident.  Bivona admitted that there was little to no damage to his vessel done by the Plaintiff's workers with the exception of the cleat on the front of the boat which was pulled out during the operation.   He admitted that the Plaintiff was under no previous duty to render assistance.  (Stip. 25). He admitted that the operation was a success. (Stip. 31).

## CONCLUSIONS OF LAW

The law of salvage generally governs efforts to save vessels in distress. "Under the law of salvage, rescuers take possession of, but not title to, the distressed vessel and its contents. A court then fashions an appropriate award for the salvors' services." Boat Raising and Reclamation v. Victory, a 56' Dania Custom, 2007 WL 4462995 * 6 (M.D. Fla. Dec. 14, 2007) (citing International Aircraft Recovery v. Unidentified Wrecked & Abandoned Aircraft, 218 F.3d 1255, 1258 (11th Cir.2000)). Three kinds of salvage services have been recognized. "Salvage services are either: (1) voluntary, wherein the compensation is dependent upon success; (2) rendered under a contract for a per diem or per horam wage, payable at all events; or (3) under a contract for a compensation payable only in case of success." Boat Raising and Reclamation, 2007 WL 4462995 at *6 (citing The Elfrida, 172 U.S. 186, 192, 19 S. Ct. 146, 43 L. Ed. 413 (1898)).  The first type of salvage referred to above is also known as "pure salvage."

The Plaintiff states that Bivona owes it $7,523.10, and this includes $1,123.10 for run time, and $6,400.00 based upon a charge of $200.00 per foot at thirty-two (32) feet.  The Plaintiff also states that it should receive its attorney's fees for having to bring the instant litigation.  The Defendant acknowledges that he owes the Plaintiff the $7,523.10 plus interest for the services rendered on March 16, 2008.  He disputes that he owes any attorney's fees pursuant to maritime and admiralty law.  The issue here hinges upon the nature of the salvage operation whether or not the Plaintiff  satisfies the three elements for pure salvage to receive a "bounty" for its services.  In the alternative, the Court must determine if the services rendered by Reliable Salvage were rendered pursuant to a contract, thus limiting any potential payment.

### *(1) Pure Salvage*

When there is a contract to undertake a salvage service, there is no "pure salvage." Triplecheck, Inc. v. Creole Yacht Charters Limited, 2007 WL 917276 *4 (S.D. Fla. Mar. 25, 2007) "If there is a contract, then the services were rendered pursuant to the contract, not voluntarily ." Id. (citing Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd., 2004 WL 3310573 *6 (S.D. Fla. Sept. 30, 2004)).  The Plaintiff alleges that the salvage of the Sea Ray was a "pure salvage."  In order to establish a claim for a pure salvage award, Plaintiff must show the following elements by a preponderance of the evidence: (1) A maritime peril from which the ship or other property could not have been rescued without the salvor's assistance; (2) a voluntary act by the salvor-that is, the salvor must be under no official or legal duty to render the assistance; and (3) success in saving, or in helping to save, at least part of the property at risk."  Boat Raising and Reclamation, 2007 WL 4462995 at *6 (citing The Sabine, 101 U.S. 384, 25 L.Ed. 982 (1879); Flagship Marine Servs. v. Belcher Towing Co., 966 F.2d 602, 604-05 (11th Cir.1992);  Klein v. Unidentified Wrecked &

Abandoned Sailing Vessel, 758 F.2d 1511, 1514-15 (11th Cir.1985)). If these three elements are established, the Court calculates the amount of the salvage award." Boat Raising and Reclamation, 2007 WL 4462995 at *6.

### (a) Maritime Peril

The Plaintiff must establish the existence of a maritime peril from which the ship could not have been rescued without the salvor's assistance. Defendants argue that no such maritime peril has been shown in this case.  "[T]he perils out of which a salvage service may arise are all of such perils as may encompass a vessel when upon waters which are within the admiralty jurisdiction of the United States; ..." Id. at *7 (citing Simmons v. The Steamship Jefferson, 215 U.S. 130, 139, 30 S. Ct. 54, 54 L. Ed. 125 (1909)). To constitute a maritime peril, the danger need not be imminent, but only reasonably apprehended.  In Boat Raising and Reclamation v. Victory, Judge John E. Steele cited to The Leonie O. Louise, 4 F.2d 699 (5th Cir. 1925), as an example to demonstrate maritime peril.  In  The Leonie O. Louise, a schooner was driven from her anchorage by a storm and went aground on the bank of the Hillsboro River.  Four other vessels were in close proximity, it was low tide, and there was not sufficient rise of the tide to float the vessel. The Court found that salvage services were performed, stating: "The fact that she had been driven up on the bank by the action of the wind and waves proves conclusively the possibility of further damage from the same sources." Boat Raising and Reclamation, 2007 WL 4462995 at *7. Although the danger was not imminent, it was reasonable to be apprehended, and there was pressing necessity for prompt action to return the schooner to the water." Id.  See also Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d 137, 139 (5th Cir. 1968); Irvine v. The Hesper, 122 U.S. 256, 7 S. Ct. 1177, 30 L. Ed. 1175 (1887) (vessel which ran aground lightly and remained upright is in peril so as to justify salvage).

Here the Sea Ray was run aground in the area around Gasparilla Pass and appears to have been in maritime peril as described in the caselaw above.  Capt. Potts testified the weather that day was calm with intermittent fog rolling in off the Gulf.  In fact, in photos submitted into evidence by the Plaintiff a fog bank can be seen on the horizon. (Pl. Ex. 1, A-G).  While the weather at the time of the salvage was calm, other than the fog it is undisputed that a cold front and associated storm were expected to reach the area in and around Gasparilla Pass later that evening or the next day.  The high tide in that area would not bring in sufficient amounts of water to float the Sea Ray free for at least another several days.

The Sea Ray, without intervention from outside, could not have been freed from the shoal until the end of the week and would have faced the approaching storm while stranded on the shoal.  Furthermore, March 16, 2008, was Easter weekend and the maritime traffic was heavy in the area around Gasparilla Pass where the Sea Ray was grounded.  Evidence was presented by Capt. Smith that he had salvaged at least fifty (50) vessels from the shoal where the Sea Ray was grounded.  The reason for so many groundings in that area was due in part to confusion created by the area's channel markers, which made it difficult to tell the shoal area from the deep water channel.

As such, the Sea Ray was in a perilous position being grounded on a shoal on a busy weekend with a poorly marked channel, intermittent fog, and lots of maritime traffic in an area known for groundings, with an approaching cold front and associated storm.  The Sea Ray was clearly in peril, particularly since it would have to survive those conditions and possible intruders if it were to remain under those conditions for as long as a week, as well as the danger that another vessel might strike the Sea Ray in the night or fog if it had to sit on the shoal for that period of time.

### *(b) Voluntary Act by the Salvor*

"So long as the services are voluntary and are not rejected by those in authority a [salvor] is eligible for salvage award in proportion to the value of his contributory efforts." Boat Raising and Reclamation, 2007 WL 4462995 at *7 (citing Legnos v. M/V Olga Jacob, 498 F.2d 666, 672 (5th Cir.1974)).  Thus, Plaintiff must establish that its conduct was a voluntary act, that is, that it lacked an official or legal duty to render the assistance, and that the assistance was not rejected by Bivona. Boat Raising and Reclamation, 2007 WL 4462995 at *7.

To determine whether services rendered by a salvor are voluntary, "nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." Id. at *7 (citing Flagship Marine Services, 966 F.2d at 605 (quoting The Camanche, 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397 (1869)). *See also* Potomac Steam-Boat Co. v. Baker Salvage Co., 123 U.S. 40, 49-50, 8 S. Ct. 33, 31 L. Ed. 75 (1887). "The fact that a shipowner requests a salvage service and that the salvors in response furnish it, *standing alone,* does not create an implied contract so as to defeat a salvage claim." Boat Raising and Reclamation, 2007 WL 4462995 at *7 (citing Flagship Marine Services, 966 F.2d at 605) (quoting Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d 137, 139 (5th Cir.1968)). Even if there is no contract to pay a given sum for services, there can be a binding oral engagement to pay for services, whether or not they prove successful, which can bar a salvage claim. Boat Raising and Reclamation, 2007 WL 4462995 at *7 (citing Flagship Marine Services, 966 F.2d at 605-06).

The Plaintiff, Reliable Salvage, was under no obligation to rescue the Sea Ray.  The Defendant Bivona testified that the Plaintiff was under no previous duty to render assistance. (Stip

25).  Bovina stated that he called to Capt. Potts and Capt. Potts replied and returned to begin the

salvage operation.  The Court finds that no contract was created by the conversation between Capt.

Potts and Bivona requesting Capt. Potts offer assistance in removing the Sea Ray from the shoal. See

Key Tow, Inc. v.  M/V Just J's, 2005 WL 3132454 * 9 (S.D. Fla. November 1, 2005) (holding that

an implied contract is not created under circumstances where a shipowner merely requests a salvage

service and the salvors in response furnish it).  Nor was a contract created when Bivona signed the

form allowing another vessel to come to his aid.  It is apparent from the testimony that essential

terms such as the price were missing from the contract, therefore a meeting of the minds never

occurred.  The Defendant Bivona offered testimony and stipulated that the Plaintiff was under no

previous duty to render assistance. (Stip 25).  Thus, the Court concludes that the salvage attempt by

Reliable was voluntary.

### (c) Success of the Salvage Operation

The Plaintiff must establish its success in saving, or in helping to save, at least part of the

property at risk. "Success is essential to the claim," and if the vessel is not saved no compensation

can be allowed.  Boat Raising and Reclamation, 2007 WL 4462995 at *7.  It is undisputed that the

Sea Ray was successfully removed from its grounded position and left under its own power.  The

Sea Ray was removed from the shoal and left the Pass under its own power.  The only damage was

the broken cleat from the front of the vessel and some minor scratches to the Sea Ray's hull where

it was grounded. (Def. Ex. 6).  Thus, the salvage operation was successful.

### (2) Contract Salvage

Contract salvage, in contrast to pure salvage, "is that type of salvage service entered into

between the salvor and owners of imperiled property by which their respective representatives" agree

to perform services.  Key Tow, Inc. v. M/V JUST J's, 2005 WL 3132454 *9 -10 (S.D. Fla. Nov. 1, 2005) (citing Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd., 2004 WL 3310573 *5 (S.D. Fla. 2004).  Where there is a contract to undertake salvage services or other service to a distressed vessel there is no pure salvage.  Key Tow, 2005 WL 3132454 at *9 -10 (citing B.V. Bureau Wijsmuller v. United States of America, 702 F.2d 333 (2d Cir.1983)).  In other words, if there is "a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise," a meritorious claim for salvage is barred.  Key Tow, 2005 WL 3132454 at *9 -10 (citing Flagship Marine Services, Inc., 966 F.2d at  605) (citing The Camanche, 75 U.S. (8 Wall.) at 477).  An implied contract is not created, however, under circumstances where a shipowner merely requests a salvage service and the salvors in response furnish it.  Key Tow, 2005 WL 3132454 at *9 -10 (quoting Fort Myers Shell & Dredging Co., 404 F.2d at 139).

The Defendant Bivona states that the Parties did not enter into a valid contract because the form he signed was not filled in with regard to the Plaintiff's fees.  The Defendant alleges that there was no contract between the Parties because the form he signed was not completed when he signed it.  He contends the work form that forms the Plaintiff's claim is was not completed when presented to the Defendant.  He further argues that he only signed the form because he was under the belief that the form was necessary to obtain use of a second vessel to aid in the salvage attempt.  None of the terms or rates used to compute the Plaintiff's salvage charge were made known to him at the time.

While Reliable Salvage places great emphasis on the act of Bivona in "signing" the contract/ invoice, its proposed findings and conclusions do not advance a theory of recovery premised on a contract. Indeed, the written "contract" is of no moment, since it is not completed nor are any

services to be rendered described within it.  For example in <u>Key Tow, Inc. v. M/V JUST J's</u>, the vessel was run aground just south of Key Biscayne Bay and stranded.  Key Tow, the Plaintiff, offered to salvage the vessel and the vessel's owner agreed.  Key Tow, had the JUST J's Captain sign the front of a blank form which provided little to no information regarding the salvage operation.  The Court held that the Key Tow written contract was  ineffectual; however, in that instance the Court found that the Parties entered in a verbal contract that eliminated the "no cure no pay" involved in a pure salvage situation. <u>Key Tow</u>, 2005 WL 3132454 at *9 -10. <u>See</u> <u>CSX Transport, Inc. v. Professional Transport, Inc.</u>, 476 F. Supp. 2d 1333, 1341 (M.D. Fla. 2006) (citing <u>Innkeepers International v. McCoy Motels, Ltd.</u>, 324 So. 2d 676, 678 (Fla. 4th DCA 1975) (holding that as a general rule the presence of blanks in a contract is fatal to the enforcement if the blanks occur in a provision dealing with an essential term of the contract).

However, unlike the instant case, in the <u>Key Tow</u> case, the vessel's owner had previously done business with Key Tow Services. <u>Key Tow</u>, 2005 WL 3132454 at *10.  While those services were not a salvage operation, the JUST J's was serviced by Key Tow only a few weeks prior to the actual salvage operation.  Thus, the Court concluded that the vessel's owner had a reasonable basis to determine the price of the salvage and found that the parties had entered into a verbal contract.

Here, Bivona had no previous business experience with Reliable whether in salvage services or vessel repair services.  Thus, he had no prior experience that would allow him to calculate the costs of the salvage operation on the Sea Ray.  Furthermore, it appears that neither Capt. Potts nor Bivona ever discussed the actual rate and costs of the salvage operation.  Thus, the Court finds there was no written or verbal contract between the Parties regarding the salvage operation.

The Court concludes that essential terms were missing from the contract and the salvage could not be considered a contract salvage.  However, all of the elements are present to create a pure salvage operation.  As such, the Court finds that the salvage operation rescuing the Sea Ray was pure salvage.

### (3) Damage Award

"Awards for performance of salvage services are not limited to a strict quantum meruit measure of the value of the services performed. Rather, the award is calculated to include a bounty or premium based upon the risk involved in the operation and the skill with which it is performed .... compensation is given as a reward for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." Id. (citing Offshore Marine Towing, Inc. v. MR23, 412 F.3d 1254, 1257 (11th Cir. 2005) (citations omitted)).  In evaluating the salvor's skill and risk, the following factors are considered: (1) the labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. Offshore Marine Towing, Inc., 412 F.3d at 1257 (citing The Blackwell, 77 U.S. (10 Wall.) 1, 13-14, 19 L. Ed. 870 (1869)). The calculation of each salvage award is specific to the facts of each case, and these factors are a guide to measure both the cost to the salvors of performing the service and the benefit to the salvee. Id.  The amount of salvage awarded is largely a matter of fact and discretion, which cannot be reduced to precise rules, after consideration of all the circumstances." Boat Raising and

Reclamation, 2007 WL 4462995 at *6 (citing The Connemara, 108 U.S. 352, 359, 2 S. Ct. 754, 27 L. Ed. 751 (1883)).

### (a) The Labor Expended by Reliable

Reliable had to call a second vessel and eventually a third vessel to "light wash" a channel deep enough to float the Sea Ray free of the shoal.  Overall, Reliable expended in excess of five hours, used three vessels, and three employees to accomplish the salvage operation.  This includes the run time for the vessels.  However, Capt. Smith noted in his testimony that the Defendant was only charged for the run time on one vessel, Capt. Potts vessel, rather than the run time for all three vessels.

### (b) The Promptitude, Skill, and Energy Displayed in Rendering the Service

Capt. Potts explained that two (2) of the vessels used to rescue the Sea Ray were larger than the vessel he used with a lower gear ratio and inboard motors that would allow them to perform a "light wash."  A light wash is performed by backing the vessels up to the Sea Ray's position.  The operation  is a combination of positioning Reliable's two primary vessels in such as way as to wash a channel back to Bivona's vessel and create a deep enough trough to be able to pull and wash the Sea Ray off of the shoal and into deeper water.  The rescue of the Sea Ray was performed with minimal damage to the vessel and based upon the nature of the operation and testimony at trial the crew members of Reliable responded promptly to the Sea Ray and used skill, energy, and creativity to perform a delicate operation to free the Sea Ray.

### (c) The Value of the Property Employed and the Danger to Which the Property was Exposed

The Plaintiff utilized three vessels to effect the rescue of the Sea Ray.  Two of the vessels were larger and used lower gear ratios that enabled them to back into the shoal and excavate a

channel that would allow the Sea Ray to float free.  As for the danger, there was some inherent danger to the salvage vessels in performing the salvage operation.  The props could have broken and/or transmissions on the two vessels excavating the trough or burned out, the rescue vessels could have become grounded themselves or floated off in the open water should prop or transmission fail during the operation.  While the seas were calm at that point in time, a storm front was approaching and fog had drifted in and out all day long, and the area around the shoal where the Sea Ray was stranded was known for stranding vessels, confusing channel markers, and collisions with other vessels.  Furthermore, it was Easter weekend and the waters in and around Gasparilla Pass were busy and the dangers of a collision between Reliable's vessels and other vessels were increased.  Thus, Reliable's vessels were in danger while attempting to complete the salvage.

### (d) The Risk Incurred by the Salvors in Securing the Sea Ray

The risk incurred by the Plaintiff was low.  The weather was calm, the seas were calm with little to no wave action, and no immediate storm in the area. However, Capt. Smith testified that the vessels used in the Reliable business are under significant distress during an operation such as that performed for Bivona. He stated that significant engine deterioration occurs and that as few as three such jobs would require Reliable to undertake significant engine repairs.  Capt. Smith also spoke of the cost of crew and fuel in projects such as that in the instant case, wherein the fuel charges are significant and the crew typically receives one-third of the stated invoice.  Capt. Smith also testified about the financial burden of collecting against boaters who fail to pay such invoices.

### (e) The Value of the Sea Ray

Little evidence was presented regarding the value of the Sea Ray.  Bivona testified that he paid $220,000.00 for the vessel in 2005.  The vessel was rescued in 2008, so the Court would have

to determine the value of the vessel at the time of the salvage operation.  The average price for the sale of a 2005 Sea Ray 320, in the Fort Myers, Florida geographical area in 2010 was $102,000.00. However, the grounding occurred in 2008.  Given the difference between the purchase price $220,00.00 and value of $102,000.00 in 2010, the Court finds the value of the Sea Ray in 2008 to be $140,000.00.

### (f) Degree of Danger for the Sea Ray

While the Sea Ray was in peril the degree of danger at that moment was not great.  The Sea Ray was grounded, but it was still daylight and the seas were calm during the salvage operation.  The Sea Ray was lodged on the shoal with little exterior damage in approximately ten (10) inches of water.

The range of awards as a percentage of salved values have varied from four percent (4%) to twenty-five percent (25%).  Boat Raising and Reclamation, 2007 WL 4462995 at *10 (citing Margate Shipping Co. v. M/V  J.A. Orgeron, 143 F.3d 976, 994-95 (5th Cir. 1998)).  Given the circumstances in this instance, the Court in its discretion finds the salvage award is ten percent (10%).  Ten percent (10%) of the determined value of the Sea Ray of $140,000.00 is $14,000.00. Thus, the Court finds that a salvage award of $14,000.00 is appropriate.

### (4) Attorney's Fees

Under federal maritime law, a prevailing party is not entitled to attorney's fees in an admiralty case unless fees are statutorily or contractually authorized.  Stires v. Carnival Corp., 243 F. Supp. 2d 1313, 1323 (M.D. Fla. Nov. 7, 2002) (citing Coastal Fuels Marketing, Inc. v. Florida Exp. Shipping Co., Inc., 207 F.3d 1247, 1250 (11th Cir. 2000) (citing Galveston County Navigation District No. 1 v. Hopson Towing Co., Inc., 92 F.3d 353, 356 (5th Cir.1996)); Noritake Co., Inc. v.

M/V Hellenic Champion, 627 F.2d 724 (5th Cir. 1980) (absent specific federal statutory authorization for an award of attorney's fees, the prevailing party is generally not entitled to those fees); Doe, 145 F. Supp. 2d at 1348 (citing Garan, Inc. v. M/V Aivik, 907 F. Supp. 397, 399 (S.D. Fla.1995) (holding that federal maritime common law preempted state statute that permitted recovery of attorney's fees)). Although courts have increasingly applied state law as a supplement to the federal maritime law, such applications are only valid when federal statutory or common law is silent on the issue. Stires, 243 F. Supp. 2d 1313, 1323 See, e.g., Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 75 S. Ct. 368, 99 L. Ed. 337 (1955). The federal law regarding the award of attorney's fees in the maritime context is clear and directs each side to pay its own fees. Garan, 907 F. Supp. at 399.

Nevertheless, courts have found that an award of attorney's fees in an admiralty dispute is valid when one party willfully and persistently refused to pay the plaintiff what was plainly owed to him. Southeastern Marine, LLC. v. Motor Yacht Ocean Club, 2010 WL 2540701 * 5 (M.D. Fla. June 21, 2010) (citing Vaughan v. N.J. Atkinson, 369 U.S. 527, 530-31, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962)); Compania Galeana v. M/V Caribbean Mara, 565 F. 2d 358 (5th Cir. 1978) (holding that granting attorney's fees was discretionary in admiralty actions and specifically in salvage cases). In determining whether the Court should exercise its discretion, "consideration [should be] given to the necessity for the litigation and the trial upon the issues raised." Southeastern Marine, 2010 WL 2540701 at * 5 (quoting Southernmost Marine Services, Inc. v. One (1) 2000 Fifty Four Foot, 250 F. Supp. 2d 1367, 1381 (S.D. Fla. 2003)).

It is clear from the evidence and testimony presented at trial that Bivona's defense in this matter was frivolous and brought forth in bad faith. Bivona in his testimony acknowledged that he

is personally responsible for the $7,523.10 in fees charged by Reliable for the salvage operation performed on March 16, 2008.  He does not dispute that the salvage was successful, nor does he attribute bad faith to Reliable for its actions, costs, or prices.  Yet, in spite of his admissions, the Defendant Bivona has not paid a single cent on the invoice due for Reliable's services in over three years.  Thus, the Court, in its discretion, finds that the Defendant Bivona willfully and persistently refused to pay the Plaintiff, Reliable Salvage, what was plainly owed for the services rendered.  Therefore, the Defendant Michael Bivona is liable for the Plaintiff's attorney's fees and costs for his persistent and willful refusal to pay Reliable's charges for salvaging the Sea Ray.

Accordingly it is hereby

**ORDERED:**

(1) **JUDGMENT** shall be entered on the Complaint (Doc. # 1) as follows:

(a) In favor of the Plaintiff  Reliable Salvage as to Count I, Salvage Claim in the amount of **$14,000.00**.

(b) In favor of the Defendant M/V 35' Sea Ray as to Count II, the Maritime Lien Claim for Contracted Salvage.

(c) Further this Court deems it just and appropriate to grant the Plaintiff's request for Attorney's Fees and Costs.  The Court shall maintain jurisdiction over the issue of attorney's fees.  The Plaintiff, Reliable Salvage, shall submit to the Court a detailed billing statement of the attorney's fees and costs expended in bringing this action to trial on or before **Monday, April 18, 2011.**

(2) The Defendant, Michael Bivona's, Oral Motion for Directed Verdict (Doc. # 54) is **DENIED**.

(3) The Plaintiff, Reliable Salvage's, Oral Motion for Directed Verdict (Doc. # 55) is

**DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida,  this __21st__ day of March, 2011.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record